IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

LOURDES GUADALUPE LORED ALANIS                                                   PLAINTIFF

v.                                                            CIVIL ACTION NO. 3:16-cv-00268-GHD-RP

JOSE CARMEN BADILLO REYES                                                         DEFENDANT

## MEMORANDUM OPINION

Presently before the Court is a verified petition [1] for return of minor child to Petitioner Lourdes Guadalupe Lored Alanis ("Petitioner") and for immediate issuance of a show cause order to Respondent Jose Carmen Badillo Reyes ("Respondent") under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603. Upon due consideration, the Court finds that the petition should be granted.

### *I.  Procedural Background*

On September 26, 2016, Petitioner filed an application pursuant to the Hague Convention with the Mexican authorities, claiming that Respondent had wrongfully retained her minor child, DFB, from the child's habitual residence of Mexico. Pet. [1] ¶ 10. On November 21, 2016, Petitioner filed in this Court her verified petition [1] for return of her minor daughter under the Hague Convention. On December 12, 2016, Respondent was served with process by the DeSoto County Sheriff's Department. *See* Summons Returned Executed [7].

On January 5, 2017, Petitioner filed an expedited motion [8] for preliminary relief and for an expedited hearing. In her motion, Petitioner requested that this Court (1) prohibit Respondent from removing the child from the jurisdiction of this Court and (2) set a hearing on the petition, commanding Respondent to appear before the Court with the child to show cause why she was

1

allegedly unlawfully abducted and retained in the United States in contravention of Mexican law and the Hague Convention. The Court construed Petitioner's expedited motion as a motion for a temporary restraining order and preliminary injunction hearing pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, and on January 9, 2017, entered an Order [9] and memorandum opinion [10] granting the relief requested in the expedited motion. Specifically, the Court ordered service of process on Respondent and set a show cause/preliminary injunction hearing for January 26, 2017, requiring the presence of all parties. *See* Fed. R. Civ. P. 65(b)(3). The Court further entered a temporary restraining order prohibiting Respondent and anyone else from removing DFB from the State of Mississippi or otherwise changing the child's present location until the date of the hearing. *See* Fed. R. Civ. P. 65. On January 12, 2017, Petitioner effectuated service of process on Respondent through the DeSoto County Sheriff's Department of Petitioner's expedited motion for relief [8], the Court's Order [9] and memorandum opinion [10] granting same, and the Court's notice of hearing [11] on the expedited motion.

On January 26, 2017, the Court conducted a hearing on the motion; Petitioner, Respondent, and DFB were present. Upon due consideration, the Court ruled from the bench that the petition should be granted and that DFB should be returned to Petitioner in Mexico. The reasoning for that decision is as follows.

## *II.   Analysis and Discussion*

The verified petition in the case *sub judice* was filed pursuant to the Hague Convention, a treaty ratified by the United States in 1988, as well as ICARA, the federal statute through which Congress implemented the Hague Convention in 1988. *See Lozano v. Montoya Alvarez*, —— U.S. ——, 134 S. Ct. 1224, 1229, 188 L. Ed. 2d 200 (2014) (citing 102 Stat. 437, 42 U.S.C. §§ 11601–11610). "The Hague Convention was adopted to address the problem of international

child abductions during domestic disputes." *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014) (citing *Lozano*, 134 S. Ct. at 1228). The objectives of the Hague Convention are: (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State,"[1] and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States." Hague Convention, art. 1; *Delgado v. Osuna*, 837 F.3d 571, 577 (5th Cir. 2016).

Petitions filed under the Hague Convention must be handled in an expeditious manner. *Chafin v. Chafin*, —— U.S. ——, 133 S. Ct. 1017, 1027, 185 L. Ed. 2d 1 (2013) ("[C]ourts can and should take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation. . . . Expedition will help minimize the extent to which uncertainty adds to the challenges confronting both parents and child."); *Hernandez v. Garcia Pena*, 820 F.3d 782, 790 n.7 (5th Cir. 2016) ("Prompt resolution of international child abduction cases is essential to safeguarding the best interests of the child and upholding the core spirit of the [Hague] Convention.").

"When a parent abducts a child and flees to another country, the Hague Convention . . . generally requires that country to return the child immediately if the other parent requests return within one year." *Lozano*, 134 S. Ct. at 1228. "Th[e return] remedy, in effect, lays venue for the ultimate custody determination in the child's country of habitual residence rather than the country to which the child is abducted." *Id.* "Return is not required if the parent seeking it was not exercising custody rights at the time of the . . . retention or had consented to . . . retention, if there is a 'grave risk' that return will result in harm, if the child is mature and objects to return, or if return would conflict with fundamental principles of freedom and human rights in the state from which return is requested." *Chafin*, 133 S. Ct. at 1021.

---

[1] Petitioner maintains that this is a wrongful retention case under the Hague Convention.

"When evaluating a Hague Convention claim, we do not assess the merits of the underlying custody dispute. Rather, our inquiry is limited to determining whether or not the child has been wrongfully [retained] from their country of 'habitual residence.'" *Delgado*, 837 F.3d at 577 (citing *Berezowsky*, 765 F.3d at 465).

The Fifth Circuit has stated the burden of proof as follows:

> For the [P]etitioner to prevail, [s]he must establish three elements by a preponderance of the evidence: (1) that the [R]espondent . . . retained [DFB] somewhere other than [DFB's] habitual residence; (2) that the . . . retention violated the [P]etitioner's rights of custody under the habitual-residence nation's laws; and (3) that at the time of . . . retention, [P]etitioner was exercising those rights or would have exercised those rights but for the . . . retention.

*See id.* (internal citation omitted); *see also Lozano*, 134 S. Ct. at 1231.

In the case *sub judice*, Petitioner argues that the minor child, DFB, was wrongfully retained in the United States by Respondent, away from the child's habitual residence in Mexico. Based on the foregoing principles, to establish a *prima facie* case of wrongful retention, Petitioner must demonstrate that (1) Mexico was DFB's habitual residence; (2) DFB was retained in the United States in breach of Petitioner's legal rights of custody under Mexican law; and (3) Petitioner was exercising her rights of custody at the time of the retention. *See* Hague Convention, arts. 3, 13.

### 1. *Habitual Residence*

First, Petitioner must demonstrate by a preponderance of the evidence that Respondent wrongfully retained DFB outside of DFB's "habitual residence." *See Delgado*, 837 F.3d at 577–78. "The [Hague] Convention does not define 'habitual residence.'" *Id.* at 578. Therefore, the Court must conduct a "fact-intensive determination that necessary varies with the circumstances of each case." *See id.*

Under Fifth Circuit law, the Court must "begin[] with the parents' shared intent or settled purpose regarding their child's residence," not "ignor[ing] the child's experience," but "giv[ing] greater weight to the parents' subjective intentions relative to the child's age." *See id.* (quoting *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012) (quotation marks omitted)). "Much of the existing case law discussing a child's habitual residence involves situations where the parents were still together at the time of the child's birth, made plans for the child's future, and only later did the family unit begin to dissolve. In these situations, the court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Id.* at 578 n.4 (quoting *Berezowsky*, 765 F.3d at 468 (internal quotation marks and citations omitted)). "A shared parental intent requires that the parents actually share or jointly develop the intention. In other words, the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together." *Berezowsky*, 765 F.3d at 468 (emphasis in original).

Both Petitioner and Respondent are citizens of Mexico. Pet. [1] ¶ 4. Hearing testimony from both Petitioner and Respondent unequivocally demonstrates that the two began a relationship 2005 in Mexico, that Respondent later moved to the United States, that Petitioner later moved to the United States, and that both of them resumed their relationship. *See* Hr'g Tr. Both Petitioner and Respondent also testified that they were in the United States illegally. DFB was born on September 9, 2007 in Southaven, Mississippi. *See id.* DFB is thus a citizen of the United States. Pet. [1] ¶ 4; Pet'r's App. [1-3] at 4. Petitioner and Respondent remained unmarried. *See* Hr'g Tr. Both Petitioner and Respondent were acknowledged as DFB's biological parents on her birth certificate. Birth Cert. [1-3] at 36. Respondent has since questioned whether he was the father of DFB. *See* Hr'g Tr. Respondent testified at the hearing

that he ordered a paternity test kit on the internet and, according to the instructions, sent to the testing company samples of DFB's saliva and his own, as well as photographs. *See id.* Respondent testified that the result of that paternity test was that he was not the father of DFB. *See id.*

From September 2007 to December 2009, Petitioner, Respondent, and DFB lived together in Mississippi. *See id.* As stated, neither Petitioner nor Respondent had any "immigration status that allow[ed] them to permanently reside in the United States," which supports that the United States was not the country of DFB's habitual residence. *See Berezowsky*, 765 F.3d at 474. DFB was not "living in a country on a footing of some stability." *See id.* at 467 (quoting *Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003) (quoting Dr. E.M. Clive, "The Concept of Habitual Residence," The Juridical Review part 3, 138, 146 (1997) (internal quotation marks omitted)).

Petitioner maintains that she, Respondent, and DFB shared a house with friends following DFB's birth in Mississippi, but that the friends asked them to move after witnessing Respondent's "extreme" and "constant" verbal and physical abuse of Petitioner. Pet'r's App. [1-3] at 4–5. Respondent's version of the story is that the friends asked them to move after becoming aware of Petitioner's infidelities. *See* Hr'g Tr. The parties agree that the two of them subsequently moved with DFB into a mobile home and that their relationship increasingly deteriorated. *See id.* Petitioner maintains that she "really feared for my and my daughter's life" and desired to "run away from [Respondent] and ask the police for help," but "did not speak any English" and "did not have a job, money, a car (did not know how to drive one)" or have any relatives in the United States she could ask for help. Pet'r's App. [1-3] at 4–5.

As demonstrated by the record, including the hearing testimony, the parties agree that Petitioner left the mobile home where she, Respondent, and DFB were living and began staying at the home of friends, when Respondent confronted her there and asked her to return to their home. *See* Hr'g Tr. At that time, the parties agree that Petitioner stated her intent to move to Mexico with the child, and that Respondent agreed with this decision. *See id.* Thus, on December 3, 2009, Respondent executed a notarized travel permit for DFB to travel with Petitioner. *See* Travel Permit [1-2] at 1. It is thus undisputed that both parties intended that DFB would move to Mexico with Petitioner.

Petitioner and DFB moved to Petitioner's family home in Ciudad Fernandez, San Luis Potosi, Mexico in December 2009 or early 2010. *See* Pet. [1] ¶ 6; Hr'g Tr. Petitioner and Respondent apparently ended their relationship. Pet. [1] ¶ 5; Hr'g Tr. For at least two years, Respondent remained in communication with Petitioner and DFB and sent money to cover their basic needs. Pet. [1] ¶ 5; Hr'g Tr. Petitioner began living with a man, Ruben Gonzalez Espinoza. Pet. [1] ¶ 6; Hr'g Tr.[2] Petitioner and Espinoza had two children. Pet. [1] ¶ 6; Hr'g Tr. Petitioner, Espinoza, DFB, and the other two children lived together until August of 2016. Pet. [1] ¶ 6; Hr'g Tr. Petitioner maintains the family had a stable home environment and that Espinoza treated DFB as his own daughter—though this point is disputed by Respondent. Pet. [1] ¶ 13; Hr'g Tr.

On August 14, 2016, Petitioner granted temporary authorization for DFB to travel with Epinoza's sister, Anel G. Valdivia, from Mexico to Valdivia's home in Irving, Texas. Pet. [1] ¶ 7; Authorization to Travel Abroad with Temporary Custody ("Temporary Authorization") [1-3] at 53–55; Hr'g Tr. Petitioner also granted temporary custody of DFB to Valdivia for the time

---

[2] Apparently, Espinoza and Petitioner were never formally married, but deem their relationship to be a common-law marriage.

that DFB was in the United States. Temporary Authorization [1-3] at 53–55; Hr'g Tr. Respondent subsequently discovered that DFB was in Irving, Texas. Pet. [1] ¶ 7; Hr'g Tr. Respondent testified that he traveled to Irving to DFB's school and requested to take her with him. *See* Hr'g Tr. However, the school principal and administrators denied his request, purportedly because Respondent did not have paperwork demonstrating that he was the child's father. *See id.* Testimony at the hearing unequivocally demonstrated that Respondent took DFB for one weekend with Valdivia's consent, but not Petitioner's, and that when Petitioner learned that DFB had visited with Respondent, she was not pleased. *See id.* Respondent testified that he then retrieved paperwork demonstrating that he was the father of DFB. *See id.* The record unequivocally demonstrates that on August 31, 2016, Respondent traveled to Irving, Texas; showed up at Valdivia's residence with a police officer from the Irving Police Department; and demanded custody of DFB as her father. *See* Pet. [1] ¶ 8; Pet'r's App. [1-3] at 9; Hr'g Tr. Petitioner maintains that during this event, Valdivia called Petitioner and had her talk to the police officer and that Petitioner "asked him not to allow [Respondent] to take [DFB] with him" and explained their situation to him. Pet'r's App. [1-3] at 9; Hr'g Tr. The police officer nonetheless allowed Respondent to take DFB with him, stating that Respondent's paperwork demonstrated that he was the father of the child and had the right to take the child. Pet'r's App. [1-3] at 10; Hr'g Tr. It is undisputed that Respondent subsequently took DFB to Horn Lake, Mississippi, against Petitioner's wishes. *See* Pet. [1] ¶ 8; Pet'r's App. [1-3] at 10; Hr'g Tr.

Petitioner maintains that more than ten times she requested that Respondent return DFB to Petitioner in Mexico, but that Respondent refused to respond to her requests and stopped answering Petitioner's phone calls. Pet. [1] ¶ 9; Hr'g Tr. Petitioner states that she is "so afraid and scare[d] of what c[ould] happen to my daughter," due to Respondent's past alcohol and drug

8

abuse and the fact that Petitioner has only been allowed to talk to DFB "a few times and for a few minutes" during which time Petitioner maintains DFB was on speaker phone and "someone was whispering to her about what she should respond." Pet'r's App. [1-3] at 10.

Respondent testified in the hearing that he is concerned for the child's well-being in Mexico and that he has taken her to a psychologist in Mississippi to address psychological issues and learning disabilities. *See* Hr'g Tr. Respondent also testified that Petitioner's lifestyle is unstable. *See id.* Although Respondent testified that he is an illegal immigrant in the United States, and has doubts about whether he is the father of DFB, he nonetheless requested that DFB be allowed to remain with him and not return to Petitioner in Mexico. *See id.* Respondent testified that if the child is returned to Mexico, he requests that Petitioner have her examined for psychological problems and learning disabilities, including dyslexia. *See id.*

In cases such as this one, where the child is so young that she cannot possibly decide the issue of residency, *see England v. England*, 234 F.3d 268, 273 (5th Cir. 2000), "the threshold test is whether both parents intended for the child to abandon the [habitual residence] left behind," *see Delgado*, 837 F.3d at 578 (citing *Larbie*, 690 F.3d at 310–11). The Fifth Circuit indicates that "context, rather than specific periods of time spent in one location or another, is key to the concept" and that the "primary consideration in the habitual residence determination [is] shared parental intent." *Berezowsky*, 765 F.3d at at 467–69.

Upon careful consideration of all the facts and testimony, the Court finds that Petitioner has demonstrated by a preponderance of the evidence that DFB's habitual residence is Mexico. As stated, neither Petitioner nor Respondent was in the United States legally. Their illegal immigration status and the unsteady and temporary nature of their living arrangements in the United States indicate that the United States was not DFB's habitual residence. Both parties

agreed that Petitioner and DFB would move to Mexico. Because Petitioner had no legal basis for entering the United States, Respondent could not reasonably have expected her to return to the United States with DFB. Furthermore, Respondent's doubts as to whether he was the father of the child raise a question as to whether he even had parental rights. Regardless, both parties further agree that DFB lived continuously in Mexico from 2010 to 2016, where she attended school. The parties apparently further agree that Petitioner began living with a man, Espinoza, and that Petitioner and Espinoza had two children together. Petitioner maintains that Espinoza treats DFB as his own child and that the family lived in a stable home environment—though these points are disputed by Respondent. Furthermore, it is undisputed that Respondent sent Petitioner money to cover basic needs for at least two years after Petitioner and DFB moved to Mexico. Petitioner maintains that Respondent eventually ceased financial support of DFB, though this point is disputed by the parties and Petitioner's alleged facts and testimony on this point conflict. *See* Pet. [1] ¶ 5; Pet'r's App. [1-3] at 6–7. Based on all of the foregoing, the Court concludes that Petitioner has demonstrated by a preponderance of the evidence that DFB's habitual residence is Mexico.

### 2. *Existence of Rights of Custody*

The second element Petitioner must prove by preponderance of the evidence is that DFB was wrongfully retained in United States in breach of Petitioner's legal rights of custody under Mexican law. The Court must consult the Hague Convention's definition of "rights of custody." *See Abbott v. Abbott*, 560 U.S. 1, 12, 130 S. Ct. 1983, 176 L. Ed. 2d 789 (2010). "This uniform, text-based approach ensures international consistency in interpreting the [Hague] Convention. It forecloses courts from relying on definitions of custody confined by local law usage, definitions that may undermine recognition of custodial arrangements in other countries or in different legal

traditions, including the civil-law tradition." *Id.*, 130 S. Ct. 1983. The Hague Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.*, art. 5(b). When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-retaining parent had "rights of custody" within the meaning of the Convention. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004).

Because Mexico is DFB's habitual residence, the Court must apply Mexican law to determine whether Petitioner had rights of custody with respect to DFB at the time of the wrongful retention. According to the Family Code of the State of San Luis Potosi, parental rights are "the set of rights and duties granted by law to the mother and father" and include responsibilities to "take care of, protect, and educate" the child. *See* Excerpts, Family Code of the State of San Luis Potosi [1-4], arts. 268, 270, 293, 300. When one parent stops exercising parental rights, the other parent is responsible to do so. *See id.*, art. 270. In the case *sub judice*, it is undisputed that the parties were unmarried and ceased their romantic relationship while physically separated. In such a situation, in the absence of a parental rights agreement, the court determines the parental rights for the best interest of the child. *See id.*, art. 275. Because Petitioner has demonstrated by a preponderance of the evidence that she had parental rights with respect to DFB for the approximate six years the two lived in Mexico, enrolling her in school and extracurricular activities, maintaining a household wherein DFB resided, and otherwise engaging in parental responsibilities, Petitioner has demonstrated by a preponderance of the evidence that

she had parental rights with respect to DFB. The Court now turns to the third element of the case, whether Petitioner has demonstrated exercise of the rights of custody at the time of the wrongful retention of DFB.

### 3. Exercise of Rights of Custody

Under Article 13(a) of the Hague Convention, a court does not have to order the return of a wrongfully retained child if the non-retaining party was not "exercising" his or her custody rights at the time of retention. Article 13(a) does not define 'exercising,' so courts have looked to the [Hague] Convention's underlying purposes for guidance in applying this exception." *Rodriguez v. Yanez*, 817 F.3d 466, 472 (5th Cir. 2016). American courts interpret "exercise" broadly. *Id.* (citing *Sealed Appellant*, 394 F.3d at 344). Because Petitioner has demonstrated by a preponderance of the evidence that she had custody rights under Mexican law and the Hague Convention, she "need only make the final, and 'relatively easy,' showing that 'at the time of . . . retention those rights were actually exercised but for the . . . retention." *See Larbie*, 690 F.3d at 307. Courts " 'liberally find' that rights of custody have been exercised unless evidence demonstrates 'acts that constitute clear and unequivocal abandonment of the child." *Id.*

DFB lived with Petitioner in Mexico from 2010 to 2016 prior to the retention. On August 14, 2016, Petitioner granted temporary authorization for DFB to travel with Espinoza's sister, Valdivia, from Mexico to Valdivia's home in Irving, Texas. Petitioner additionally signed documentation granting temporary legal custody of DFB to Valdivia "during the time [DFB] is living in the United States of America," specifically "authorizing [Valdivia] to make any decision regarding [DFB's] nutrition, education, recreation[,] and any other activities, and to take any decisions . . . necessary . . . in case of sickness, including medical prescriptions, surgeries, and any others related to her health." Pet. [1] ¶ 7; Temporary Authorization [1-3] at 53–55; *see*

Hr'g Tr. Petitioner states that "[DFB] was to travel with [Valdivia] and if she was happy she could even sign[ ] her up at a local school, otherwise she would immediately bring her back to us because [Valdivia] visits her family in Mexico almost every week." Pet'r's App. [1-3] at 8–9; Hr'g Tr. In the hearing, both Valdivia and Petitioner testified about the arrangement. Petitioner testified that she wanted DFB to learn English and attend school during the week, but to return to Petitioner's home in Mexico every weekend and holiday. *See* Hr'g Tr. Valdivia confirmed that this was the agreement. *See id.* Accordingly, DFB traveled with Valdivia from Mexico to Valdivia's home in Irving, Texas, and Valdivia enrolled DFB in a local elementary school, with Petitioner's knowledge and consent, and with the understanding that Valdivia would return the child to her mother's home in Mexico on weekends and holidays. Pet'r's App. [1-3] at 9; Temporary Authorization [1-3] at 53–55; Hr'g Tr.

The Court finds that based on all of the foregoing, Petitioner was exercising custody rights with respect to DFB at the time of the wrongful retention. Although Petitioner temporarily agreed to allow DFB to attend school in the United States with Valdivia, by definition, that was a temporary arrangement. Further, the Court finds a crucial factor in the determination is the arrangement for Valdivia to transport DFB to her mother's home in Mexico on weekends and holidays. At the hearing, Petitioner argued that it was akin to a boarding school situation. The Court finds this analogy to be well taken. Petitioner has demonstrated by a preponderance of the evidence that she was exercising her parental rights at the time of the wrongful retention. Given all the facts and testimony before the Court, Petitioner has demonstrated that Respondent wrongfully retained DFB in the United States away from her habitual residence in Mexico.

Finally, the Court finds that Respondent has failed to demonstrate any applicable affirmative defenses. Respondent did not plead any defenses, as he filed no responsive pleading

to the verified petition [1]; his time for doing so expired on January 3, 2017. *See* Summons Returned Executed [7]. Therefore, as Petitioner correctly argues, Respondent has waived any affirmative defense under the Hague Convention. However, even assuming, *arguendo*, Respondent did not waive his affirmative defenses, at the hearing, he failed to demonstrate that any defenses applied to the case *sub judice*. "Even if a petitioner establishes [a wrongful retention under the Hague Convention], a court may still deny a petition if the respondent proves one of several narrow affirmative defenses to wrongful . . . retention." *See Delgado*, 837 F.3d at 577 (internal citation omitted). A court is not required to order the return of the child if:

> (1) the petitioner was not actually exercising custody rights at the time of . . . retention ([Hague Convention,] Article 13a); (2) the petitioner consented to or subsequently acquiesced in the . . . retention (Article 13a); (3) the petition for return was filed more than one year after the date of the . . . retention and the child is now settled in her new environment (Article 12); (4) there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation (Article 13b); or (5) return of the child would violate fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Article 20).

*Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *4 (S.D. Tex. Sept. 28, 2016) (quoting *Vazquez v. Estrada*, 3:10-CV-2519-BF, 2011 WL 196164, at *2 (N.D. Tex. Jan. 19, 2011) (internal quotation marks omitted)). The first three defenses must be proved by a preponderance of the evidence; the last two must be proved by clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

Petitioner filed her verified petition for return of DFB on November 21, 2016. The wrongful retention occurred on August 31, 2016. Therefore, Petitioner timely filed her verified petition well within one year of the wrongful retention. Further, Respondent failed to sufficiently refute Petitioner's position that DFB would return to a stable family environment in

14

Mexico and provide clear and convincing evidence of the same. Also, at nine years of age, DFB is not of a sufficiently mature age to have her preferences for living arrangements be taken into account. *See England*, 234 F.3d at 273. Finally, Respondent has not presented evidence that the return of DFB to Mexico would violate fundamental principles such that return would be inappropriate. Accordingly, Respondent has failed to demonstrate the applicability of any affirmative defenses. Petitioner has successfully demonstrated by a preponderance of the evidence that Respondent wrongfully retained DFB in violation of the Hague Convention.

### III. Conclusion

In sum, the Court finds that Petitioner Lourdes Guadalupe Lored Alanis has met her burden to show by a preponderance of the evidence that her daughter, DFB, was wrongfully retained from her habitual residence of Mexico by Respondent Jose Carmen Badillo Reyes in violation of the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and the International Child Abduction Remedies Act, 42 U.S.C. § 11603 ("ICARA"). *See Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014) (citing 42 U.S.C. § 11603(e)(1)(A)). Respondent has not met his burden to establish that any exceptions apply to the wrongful retention. Accordingly, pursuant to the Hague Convention and ICARA, the Court shall order the following:

(1) The verified petition for return of minor child [1] is GRANTED;

(2) Anel Valdivia is hereby required to promptly return the minor child, DFB, to the home of her mother, the Petitioner, in Ciudad Fernandez, San Luis Potosi, Mexico, given that Petitioner is unable to travel to the United States. Mexico is the child's country of habitual residence. Only Valdivia shall be permitted to take DFB to Mexico to her mother, the Petitioner. Unless the parties agree otherwise, Petitioner

shall incur the cost of transporting DFB to Mexico. The cost of this transportation may be subject to reimbursement under the Hague Convention and/or ICARA. It is the responsibility of Petitioner to file any appropriate motion for any such reimbursement.

**(3)** Neither the Respondent, nor anyone on his behalf, shall remove DFB from the Northern District of Mississippi or Valdivia's residence or any other place, pending DFB's return to Mexico.

The Court recommends that Petitioner promptly seek appropriate medical and psychological treatment for the child, DFB. She should further receive appropriate educational opportunities.

The Court is "without power to reach the merits of the underlying custody dispute." *See Berezowsky*, 765 F.3d at 475; Hague Convention, Art. 19. The ruling of the Court is not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention.

An order in accordance with this memorandum opinion shall issue this date.

THIS, the 30th day of January, 2017.

/s/ Glen H. Davidson
SENIOR U.S. DISTRICT JUDGE

16